## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

LARRY SMITH,           )
                         )
        Plaintiff,      )
                         )
   v.                )    No. 21-cv-12070-DML-APP
                         )
COUNTY OF WAYNE,      )    Demand For Jury Trial
ROBERT J. DONALDSON,    )
MONICA CHILDS, GENE KARVONEN, )
ROGER MUELLER, WALTER LOVE, and )
JOHN DEMBINSKI,       )
                         )
        Defendants.    )

## AMENDED COMPLAINT

Pursuant to Federal Civil Procedure 15(a)(1)(B), Plaintiff, Larry Smith submits the following Amended Complaint against Defendants, County of Wayne, Robert J. Donaldson, Monica Childs, Gene Karvonen, Roger Mueller, Walter Love, and John Dembinski:

### INTRODUCTION

1.    This is a federal civil rights action to obtain compensatory damages, punitive damages, costs and attorneys' fees for the unlawful detention of, use of fabricated evidence against, malicious prosecution of, and abuse of process against Larry Smith, resulting in Mr. Smith being held in custody in violation of his constitutional rights for almost twenty-seven years. This action also seeks injunctive and equitable relief against the County of Wayne to reform the

1

unconstitutional policy and/or custom that was the moving force behind the

constitutional rights violations suffered by Mr. Smith.

## JURISDICTION

2.      This action is brought under 42 U.S.C. § 1983 to address the

deprivation under color of law of Larry Smith's rights as secured by the United

States Constitution and under state law.

3.      The Court has jurisdiction over Larry Smith's federal claims pursuant

to 28 U.S.C. §§ 1331 and 1343, and has supplemental jurisdiction over Mr.

Smith's state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper under 28 U.S.C. § 1391(b) because the Eastern

District of Michigan is the judicial district where the constitutional rights violations

suffered by Larry Smith occurred.

## PARTIES

5.      Plaintiff, Larry Smith is a citizen of the United States of America who

at all relevant times resided in Michigan.

6.      Defendant, County of Wayne ("Defendant County"), is a body

corporate under Article VII, Section 1 of the Michigan Constitution. At all relevant

times, Defendant County was the principal and employer of Defendant, Robert J.

Donaldson who acted pursuant to Defendant County's policies and customs.

7.     Defendant, Robert J. Donaldson ("Defendant Donaldson"), at all relevant times, was an adult resident of the State of Michigan and was an assistant prosecuting attorney for the Wayne County Prosecutor's Office ("WCPO"), which is a department of Defendant County.

8.     Defendant, Monica Childs ("Defendant Childs"), at all relevant times, was an adult resident of the State of Michigan and was a Detroit Police Department ("DPD") detective.

9.     Defendant, Gene Karvonen ("Defendant Karvonen"), at all relevant times, was an adult resident of the State of Michigan and was a DPD police officer.

10.     Defendant, Roger Mueller ("Defendant Mueller"), at all relevant times, was an adult resident of the State of Michigan and was a DPD police officer.

11.     Defendant, Walter Love ("Defendant Love"), at all relevant times, was an adult resident of the State of Michigan and was a DPD police officer.

12.     Defendant, John Dembinski ("Defendant Dembinski"), at all relevant times, was an adult resident of the State of Michigan and was a DPD police officer.

## FACTS

### Facts Pertaining to the Unlawful Detention of, the Use of Fabricated Evidence against, the Malicious Prosecution of, and the Abuse of Process against Larry Smith

13.     On March 24, 1994, Kenneth Hayes ("Hayes") was fatally shot in the City of Detroit.

14.     Larry Smith did not shoot Hayes.

15.     There was no reason to suspect or believe that Larry Smith shot Hayes.

16.     The same day as the shooting of Hayes, Larry Smith turned himself in to the DPD after learning that the DPD were looking for him in connection with the shooting of Hayes.

17.     Defendant Childs interviewed Larry Smith regarding the shooting of Hayes.

18.     After the interview of Larry Smith, Defendant Childs prepared written notes of the interview.

19.     In her notes of the interview, Defendant Childs claimed that when she lied to Larry Smith and told him that witnesses to the shooting of Hayes saw his face and could identify him, Mr. Smith responded that no one could have seen his face because he had a hood on when the shooting happened.

20.     In her notes of the interview, Defendant Childs claimed that Larry Smith's statement about having a hood on was incriminating.

21.     On March 25, 1994, Larry Smith was charged with first-degree murder and possession of a firearm in the commission of a felony for the shooting of Hayes.

22.     Larry Smith was detained pursuant to legal process on March 27, 1994.

23.     Between Larry Smith's detention in March 1994 and his trial in November 1994, Defendant Donaldson asked Defendant Childs numerous times for her notes of the interview because they were not in Mr. Smith's criminal case file.

24.     Defendant Childs finally produced the notes of the interview to Defendant Donaldson in August 1994, claiming to have found the notes of the interview in a different criminal case file.

25.     Defendant Childs' notes of the interview were used against Larry Smith during his trial for the shooting of Hayes.

26.     Defendant Childs never showed Larry Smith her notes of the interview.

27.     Larry Smith never told Defendant Childs that he had a hood on at the time of the shooting of Hayes.

28.     Defendant Karvonen, Defendant Mueller, and/or Defendant Love claimed to find seven spent shell casings from a .40 caliber weapon in the area where Hayes was shot.

29.     The same day as the shooting of Hayes, the DPD conducted a search of the home where Larry Smith resided.

30.     During the search, Defendant Dembinski claimed to find an empty box of .40 caliber bullets.

31.     During the search, DPD Officer Keith Chisholm ("Chisholm") claimed to find one spent .40 caliber shell casing in an empty clothes hamper in Larry Smith's bedroom.

32.     Chisholm took the spent .40 caliber shell casing from the clothes hamper and placed it in his pocket.

33.     Keeping the spent .40 caliber shell casing in his pocket, Chisholm went to the DPD evidence room and put the casing in an envelope without placing an identifying mark on the casing.

34.     The one spent .40 caliber shell casing allegedly found by Chisholm was kept separately in the DPD evidence room from the seven spent .40 caliber shell casings allegedly found in the area where Hayes was shot.

35.     Prior to the trial of Larry Smith, the DPD removed the one spent .40 caliber shell casing allegedly found by Chisholm from the DPD evidence room and returned it several days later.

36.     DPD did not remove any of the seven spent .40 caliber shell casings allegedly found in the area where Hayes was shot from the DPD evidence room.

37.     Larry Smith did not have any spent .40 caliber shell casings in his bedroom or anywhere in his residence.

38.     Larry Smith did not have an empty box of .40 caliber bullets in his bedroom or anywhere in his residence.

39.     The trial of Larry Smith for the shooting of Hayes began on November 22, 1994.

40.     At the trial of Larry Smith, Defendant Karvonen and Defendant Mueller falsely testified that they found spent .40 caliber shell casings in the area where Hayes was shot.

41.     The spent .40 caliber shell casings allegedly found by Defendant Karvonen, Defendant Mueller, and/or Defendant Love were used against Larry Smith during his trial.

42.     The report created by Defendant Mueller about allegedly finding the spent .40 caliber shell casings was used against Larry Smith during his trial.

43.     At the trial of Larry Smith, Chisholm falsely testified that he found one spent .40 caliber shell casing in an empty clothes hamper in Mr. Smith's bedroom.

44.     The one spent .40 caliber shell casing allegedly found by Chisholm was used against Larry Smith during his trial.

45.     At the trial of Larry Smith, Defendant Dembinski falsely testified that he found an empty box of .40 caliber bullets in Mr. Smith's bedroom.

46.     The empty box of .40 caliber bullets allegedly found by Defendant Dembinski was used against Larry Smith during his trial.

47.     The bullets recovered from Hayes's body after the shooting were .32 caliber and could not have been fired from a .40 caliber weapon.

48.     Edward Chico Allen ("Allen") was in the DPD headquarters 9th floor lockup at the same time as Larry Smith.

49.     Allen was awaiting trial on charges of armed robbery for which he faced a possible sentence of life in prison.

50.     Defendant Donaldson and/or Defendant Childs promised Allen leniency in his criminal case if he falsely testified that Larry Smith bragged about shooting Hayes.

51.     Defendant Donaldson and/or Defendant Childs promised Allen housing at the DPD headquarters 9th floor lock-up instead of the jail if he falsely testified that Larry Smith bragged about shooting Hayes.

52.     While housed at the DPD headquarters 9th floor lock-up, Allen was able to have outside visitors bring him food and drugs.

53.     While housed at the DPD headquarters 9th floor lock-up, Allen was able to have guests brought to the witness rooms to have sex.

54.     At the trial of Larry Smith, Allen falsely testified that Mr. Smith had confessed to shooting Hayes.

55.     At no time did Larry Smith tell Allen that he shot Hayes.

56.     On November 25, 1994, Larry Smith was convicted of first-degree murder and possession of a firearm in the commission of a felony.

57.     After Allen falsely testified against Larry Smith, Defendant Childs and Allen had a sexual relationship.

58.     Defendant Childs would remove Allen from the DPD headquarters 9th floor lock-up under the pretext of police business and then take Allen to a hotel to have sex.

59.     On December 22, 1994, Larry Smith was sentenced to life in prison without the possibility of parole.

60.     In 2003, Allen admitted to Larry Smith that he lied during the trial when he testified that Mr. Smith confessed to shooting Hayes.

61.     When the significant error rates by the DPD Crime Laboratory became public knowledge in 2008 after an audit by the Michigan State Police ("MSP"), Larry Smith requested that the ballistics evidence from the Hayes shooting case be re-tested by the MSP.

62.     The MSP's review of the ballistics evidence determined that the one spent .40 caliber shell casing allegedly found in Larry Smith's bedroom had been destroyed, while the seven spent .40 caliber shell casings allegedly found in the area where Hayes had been fatally shot had not been destroyed.

63.     After recognizing that Larry Smith's criminal trial was unfair, the WCPO agreed that Mr. Smith's convictions should be vacated and that all charges against Mr. Smith should be dismissed.

64.     On February 4, 2021, the Third Judicial Circuit Court of Michigan terminated the criminal proceedings against Larry Smith in his favor by vacating his convictions, dismissing all charges against him, and ordering that he immediately be released from prison.

65.     Larry Smith was released from prison on February 4, 2021.

66.     Larry Smith was in custody from March 24, 1994 to February 4, 2021.

67.     The conduct of Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski, as set forth in the preceding paragraphs, resulted in damages and injuries to Larry Smith, including but not limited to loss of liberty, physical injury and sickness, and severe emotional pain and suffering.

68.     The conduct of Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski, as set forth in the preceding paragraphs, was a proximate cause of Larry Smith's damages and injuries.

69.     The conduct of Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski, as set

forth in the preceding paragraphs, was objectively unreasonable, intentional, purposeful, knowing, willful, wanton, and/or reckless, and was undertaken with malice and/or reckless disregard of Larry Smith's constitutional rights.

### Facts Pertaining to Defendant County's Unconstitutional Policy and/or Custom of the WCPO Obtaining False Statements and False Testimony for Use Against Criminal Defendants

70.    The policymakers for Defendant County and the WCPO are the Wayne County Executive, the Wayne County Commission, and/or the Wayne County Prosecutor.

71.    As will be set forth below, Defendant County had/has a policy of the WCPO obtaining false statements and false testimony for use against criminal defendants.

72.    As will be set forth below, Defendant County had/has a custom of tolerance and/or acquiescence of the WCPO obtaining false statements and false testimony for use against criminal defendants.

73.    Defendant County's policymakers were/are aware of the policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants prior to and after the constitutional violations suffered by Larry Smith, but have failed to take action to remedy the problem.

74.    As will be set forth below, Defendant County had/has a policy of the WCPO concealing the fact that the statements and testimony were false from courts and criminal defendants.

75.    As will be set forth below, Defendant County had/has a custom of tolerance and/or acquiescence of the WCPO concealing the fact that the statements and testimony were false from courts and criminal defendants.

76.    Defendant County's policymakers were/are aware of the policy and/or custom of the WCPO. concealing the fact that the statements and testimony were false from courts and criminal defendants prior to and after the constitutional violations suffered by Larry Smith, but have failed to take action to remedy the problem.

77.    Defendant County, the WCPO and the DPD had/have a pattern and practice where prisoner informants were/are planted in the DPD headquarters 9th floor lock-up to lie by claiming that their fellow prisoners confessed to crimes.

78.    Defendant County, the WCPO and the DPD have used these fabricated confessions against criminal defendants to bolster weak cases, such as the case against Larry Smith.

79.    Defendant County, the WCPO, and the DPD have used these fabricated confessions to obtain criminal convictions in cases where the conviction

could not have been obtained without the fabricated confessions, such as the case against Larry Smith.

80.     Defendant County, the WCPO, and the DPD did not use these fabricated confessions for the purpose of bringing criminal offenders to justice, but instead to obtain criminal convictions regardless of innocence, such as the case against Larry Smith.

81.     The prisoner informants falsely testified to the fabricated confessions at the criminal trials of their fellow prisoners, such as the case against Larry Smith.

82.     Defendant County, the WCPO, and/or the DPD provided favors and/or lenient treatment to the prisoner informants in exchange for the informants fabricating confessions from their fellow prisoners and/or for falsely testifying to the fabricated confessions.

83.     Prisoner informants housed at the DPD headquarters 9th floor lock-up received favors not available at the jail or to non-informants at the lock-up in exchange for the informants' false statements and/or false testimony.

84.     Prisoner informants have been able to have outside visitors bring them food and drugs.

85.     Prisoner informants have been able to invite guests to the DPD headquarters for sex.

86.     For example, Allen is a long-time provider of false statements and testimony for Defendant County, the WCPO, and/or the DPD, both before and after he made false statements about and falsely testified against Larry Smith.

87.     Defendant County, the WCPO, and/or the DPD provided Allen with immunity from prosecution, sexual favours, drugs, food, and/or money in exchange for Allen's false statements and false testimony.

88.     Besides the case against Larry Smith, Allen provided false statements and false testimony in numerous other murder cases for Defendant County, the WCPO, and/or the DPD.

89.     Allen was shown police reports so that he could falsely state and testify that his fellow prisoners confessed to the information contained in the police reports.

90.     Another example of prisoner informants to whom Defendant County, the WCPO, and/or the DPD gave leniency in exchange for fabricated prisoner confessions is Joe Twilley ("Twilley").

91.     Twilley acted as a prisoner informant providing false statements and/or false testimony in approximately 20 homicide cases.

92.     In exchange for acting as a prisoner informant, Defendant County, the WCPO, and the DPD agreed that Twilley's criminal sentence of 12-25 years

should be reduced to less than five years and that Twilley be released from custody.

93.     On July 27, 1994, the Recorders Court for the County of Wayne held an *in camera* hearing regarding Twilley acting as an informant for Defendant County, the WCPO, and/or the DPD.

94.     Rosemary Gordon ("Gordon") appeared for the WCPO at the hearing.

95.     Gordon agreed that the hearing should be a suppressed hearing.

96.     During the hearing, DPD Sergeant Dale Collins testified that Twilley had testified in at least 20 homicide cases.

97.     During the hearing, Defendant Collins testified that Twilley had assisted with numerous homicide investigations.

98.     During the hearing, Defendant Collins testified that there were several homicide cases that could not have been prosecuted with Twilley's testimony, including a recent homicide case.

99.     During the hearing, Gordon stated that Twilley had been extremely helpful to WCPO prosecutor Thomas Beadle ("Beadle") in an arson/homicide case.

100.   During the hearing, Gordon stated that Beadle supported consideration for Twilley.

101.   During the hearing, Gordon stated that she learned from other people who worked for the WCPO that Twilley had come to court to testify on numerous occasions.

102.   On July 29, 1994, the Recorders Court for Defendant County held a sentencing hearing for Twilley.

103.   Michael J. King ("King") appeared for the WCPO at the hearing.

104.   During the hearing, the Court re-sentenced Twilley to less than five years and ordered his immediate release so that he did not have to return to prison.

105.   King did not object to Twilley's re-sentencing and his release from prison.

106.   Another example of prisoner informants to whom Defendant County, the WCPO, and/or the DPD gave leniency in exchange for prisoner confessions is John Davis, also known as John Hewitt-El ("Hewitt-El").

107.   Hewitt-El falsely testified in four murder cases prosecuted by Defendant County, the WCPO, and the DPD.

108.   On September 6, 1995, attorney William Daniel ("Daniel") sent a letter to WCPO Chief Prosecuting Attorney John O'Hair ("O'Hair") about Hewitt-El's false testimony.

109.   In the letter Daniel stated that he was the attorney for Anton Mann ("Mann") who was charged with murder by WCPO attorney Tom Dawson ("Dawson").

110.   In the letter, Daniel stated that Dawson told him to speak to Mary O'Connell ("O'Connell") who was the attorney for Hewitt-El.

111.   In the letter, Daniel stated that Hewitt-El testified during a Preliminary Examination Hearing that Mann had confessed to the murder when Mann and Hewitt-El were both in custody at the 9th floor lockup of DPD headquarters.

112.   In the letter, Daniel stated that O'Connell told him that Hewitt-El recanted his testimony about Mann's admission and would take the Fifth Amendment at Mann's trial.

113.   In the letter, Daniel stated that O'Connell told him that Hewitt-El is a witness in three or four other murder cases where Hewitt-El falsely claimed that the defendants had confessed to the murders to Hewitt-El while they were in custody at the 9th floor lockup of DPD headquarters.

114.   In the letter, Daniel stated that he spoke with attorneys Robert Slameka and Ben Gorek who also represented clients whom Hewitt-El falsely testified against.

115. Daniel concluded the letter by stating that he was seeking the WCPO's guidance and to raise concern about fabricated confessions on behalf of his client, as an officer of the court, and as a citizen of the community.

116. In 1998, Hewitt-El wrote a letter to an individual named Islam Lacino-X.

117. In the letter, Hewitt-El identified Twilley, Oliver Cowan ("Cowan"), Allen Bey, and an individual named Terry as inmate informants in the 9th floor lockup at DPD headquarters.

118. In the letter, Hewitt El stated that both the DPD and the WCPO knew about inmate informants in the 9th floor lockup at DPD headquarters providing false confessions in exchange for favors and deals.

119. On June 27, 2001, Hewitt-El signed an affidavit regarding his false testimony in criminal cases.

120. In the affidavit, Hewitt-El stated that DPD detectives from the homicide unit promised to help him if he testified to overhearing confessions from his fellow inmates in the 9th floor lockup of DPD headquarters.

121. In the affidavit, Hewitt-El stated that DPD detectives from the homicide unit provided him with the information he would need to testify.

122. On November 25, 2003, there was a Motion for Relief from Judgment Hearing in the criminal proceedings against Ramon Ward.

123.   Janet Napp appeared for the WCPO at the Motion for Relief from Judgment Hearing.

124.   Hewitt-El testified at the Motion for Relief from Judgment Hearing.

125.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that Cowan told him that he could receive a deal in his murder case like Cowan and Twilley did if he helped in the Andre Grayson murder case.

126.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that Twilley told him that the DPD gave Twilley information that Twilley could testify to in exchange for a plea deal in Twilley's criminal case.

127.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that the DPD supplied him with the information that he could testify to in three different cases, but Hewitt-El took the Fifth Amendment as to whether he lied in the three cases.

128.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that the DPD provided him with conjugal visits while in the 9th floor lockup of DPD headquarters in exchange for his help in the criminal cases.

129.   Hewitt-El testified at the Motion for Relief from Judgment Hearing that he received marijuana and alcohol while in the 9th floor lockup of DPD headquarters in exchange for his help in the criminal cases.

130.   Another example of inmate informants to whom Defendant County, the WCPO and/or the DPD gave leniency in exchange for fabricated inmate confessions is Cowan.

131.   Cowan falsely testified in six murder cases prosecuted by the WCPO and the DPD.

132.   In exchange for acting as an inmate informant, the WCPO and the DPD agreed that Cowan's possible criminal sentence of 5-15 years be limited to only one year in jail and one year of probation.

133.   In 1995, Robert Agacinski ("Agacinski") was the Deputy Chief Assistant Prosecutor for the WCPO.

134.   In 1995, several attorneys for criminal defendants expressed concerns to Agacinski about the practice of placing prisoner informants in the DPD headquarters 9th floor lockup to obtain confessions from their fellow prisoners.

135.   In response to the concerns expressed by the attorneys, Agacinski wrote a memorandum to WCPO Chief of Operations Richard Padzieski ("Padzieski").

136.   In the memorandum, Agacinski stated that he had been told that prisoner informants lie about overhearing confessions and/or fabricate confessions to receive deals or favors promised to them.

137.    In the memorandum, Agacinski identified Twilley and Cowan as prisoner informants who testified to fellow prisoner confessions in several criminal cases.

138.    In the memorandum, Agacinski stated that Twilley and Cowan obtained a confession in a criminal case Agacinski had tried the prior month, which likely was a reference to the Ramon Ward criminal case.

139.    In addition to Twilley and Hewitt-El, Agacinski's memo identified Solomon Tolbert who acted as a prisoner informant.

140.    In response to Agacinski's memorandum, WCPO Chief of Research, Training, and Appeals Timothy A. Baughman ("Baughman") also wrote a memorandum to Padzieski.

141.    In his memorandum, Baughman noted that prisoner informants frequently provide false testimony of other prisoners' confessions to obtain compensation for their testimony.

142.    Numerous individuals have been wrongfully convicted as a result of Defendant County's widespread policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants, including but not limited to Larry Smith and the additional examples set forth below.

143.   Bernard Howard was wrongfully convicted of murder based upon a prisoner informant's false statement that Mr. Howard's co-defendants had implicated Mr. Howard in the crime.

144.   Ramon Ward was wrongfully convicted of murder based upon the false testimony from two prisoner informants that Mr. Ward had confessed to the crime.

145.   Lacino Hamilton was wrongfully convicted of murder based upon the false testimony from a prisoner informant that Mr. Hamilton had confessed to the crime.

146.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts in criminal cases and from criminal defendants was and/or is so widespread that 27 wrongfully-convicted individuals who spent a total of 415 years wrongfully imprisoned have been exonerated since 2018.

147.   In 2020, a total of 120 wrongfully-convicted individuals were exonerated in the entire United States of America.

148.   Defendant County and its policymakers had/have actual knowledge of the policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the

statements and testimony were false from courts in criminal cases and from criminal defendants, yet have taken no action to remedy the problems.

149.   Defendant County and its policymakers approved the policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts in criminal cases and from criminal defendants, and were deliberately indifferent to the resulting constitutional violations including, but not limited to, unlawful detentions pursuant to legal process, the use of fabricated evidence at criminal trials, and malicious prosecutions.

150.   Defendant County and its policymakers disregarded the known and obvious consequence of the constitutional violations that resulted from the policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts in criminal cases and from criminal defendants.

151.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts in criminal cases and from criminal defendants was a proximate cause of Larry Smith's damages and injuries.

152.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts in criminal cases and from criminal defendants may continue to this day.

## CAUSES OF ACTION

### COUNT I:  42 U.S.C. § 1983 – Unlawful Detention Pursuant to Legal Process Against Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski

153.   Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

154.   Larry Smith was detained pursuant to legal process based upon evidence fabricated by the above-named individual Defendants.

155.   There was neither probable cause nor reasonable suspicion to detain Larry Smith.

156.   The above-named individual Defendants acted under of color of law.

157.   The unlawful detention of Larry Smith resulted in damages and injuries to Mr. Smith.

158.   The unlawful detention of Larry Smith was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants, as set forth above.

**COUNT II:  42 U.S.C. § 1983 – Due Process/Fair Trial:  Fabrication of Evidence Against Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski**

159.   Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

160.   The above-named individual Defendants knowingly fabricated evidence that was used against Larry Smith at his criminal trial.

161.   The evidence fabricated by the above-named individual Defendants affected the decision of the jury which convicted Larry Smith.

162.   The above-named individual Defendants acted under color of law.

163.   The fabrication of evidence by the above-named individual Defendants resulted in damages and injuries to Larry Smith.

164.   The fabrication of evidence against Larry Smith was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants, as set forth above.

**COUNT III:  42 U.S.C. § 1983 – Malicious Prosecution Against Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski**

165.   Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

166.   A criminal proceeding was initiated against Larry Smith and the above-named individual Defendants made, influenced, and/or participated in the decision to prosecute.

167.   There was a lack of probable cause for the criminal prosecution against Larry Smith.

168.   As a consequence of the legal proceeding, Larry Smith suffered a deprivation of liberty apart from the initial seizure.

169.   The criminal proceedings against Larry Smith have been resolved in Mr. Smith's favor.

170.   The malicious prosecution by the above-named individual Defendants resulted in damages and injuries to Larry Smith.

171.   The malicious prosecution of Larry Smith was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants, as set forth above.

### COUNT IV:  42 U.S.C. § 1983 – Conspiracy
### Against Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski

172.   Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

173.   The above-named individual Defendants had a single plan to convict Larry Smith for the shooting of Hayes.

174.   The above-named individual Defendants shared a conspiratorial objective to deprive Larry Smith of his constitutional rights.

175.   The above-named individual Defendants committed overt acts in furtherance of the conspiracy.

176.   The above-named individual Defendants acted under color of law.

177.   The conspiracy to deprive Larry Smith of his constitutional rights resulted in damages and injuries to Mr. Smith.

178.   The conspiracy to deprive Larry Smith of his constitutional rights was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants, as set forth above.

**COUNT V:  42 U.S.C. § 1983 – Failure to Intervene**
**Against Defendant Donaldson, Defendant Childs, Defendant Karvonen,**
**Defendant Mueller, Defendant Love, and Defendant Dembinski**

179.   Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

180.   As set forth above, the above-named individual Defendants unlawfully detained Larry Smith pursuant to legal process, used fabricated evidence against Mr. Smith, and maliciously prosecuted Mr. Smith.

181.   Each above-named individual Defendant observed and/or had reason to know that Larry Smith was unlawfully detained pursuant to legal process, had fabricated evidence used against him, and was maliciously prosecuted.

182.   Each above-named individual Defendant had an opportunity to intervene in the unlawful detention of Larry Smith, the use of fabricated evidence against Mr. Smith, and the malicious prosecution of Mr. Smith.

183.   Each above-named individual Defendant failed to intervene in the unlawful detention of Larry Smith, the use of fabricated evidence against Mr. Smith, and the malicious prosecution of Mr. Smith.

184.   Each above-named individual Defendant acted under color of law.

185.   The failure to intervene in the constitutional violations suffered by Larry Smith resulted in damages and injuries to Mr. Smith.

186.   The failure to intervene in the constitutional violations suffered by Larry Smith was undertaken pursuant to Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants, as set forth above.

### COUNT VI:  42 U.S.C. § 1983 – Policy and/or Custom of the WCPO Fabricating Evidence and Suppressing Evidence Against Defendant County

187.   Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

188.   As set forth above, the above-named individual Defendants unlawfully detained Larry Smith pursuant to legal process, used fabricated evidence against Mr. Smith, and maliciously prosecuted Mr. Smith.

189.   As set forth above, Defendant County had/has a policy of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants.

190.   As set forth above, Defendant County had/has a custom of tolerance and/or acquiescence of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants.

191.   Defendant County made a deliberate choice to have a policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants.

192.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants was the moving force behind the unlawful detention of Larry

Smith, the use of fabricated evidence against Mr. Smith, and the malicious prosecution of Mr. Smith.

193.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants caused the unlawful detention of Larry Smith, the use of fabricated evidence against Mr. Smith, and the malicious prosecution of Mr. Smith.

194.   Defendant County's policy and/or custom of the WCPO obtaining false statements and false testimony for use against criminal defendants and concealing the fact that the statements and testimony were false from courts and criminal defendants resulted in damages and injuries to Larry Smith.

### COUNT VII:  Michigan State Law – Malicious Prosecution
### Against Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski

195.   Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

196.   The above-named individual Defendants caused, initiated, instituted, and/or continued a criminal prosecution against Larry Smith.

197.   The criminal proceedings against Larry Smith terminated in Mr. Smith's favor.

198.  There was no probable cause for causing, initiating, instituting, and/or continuing the criminal prosecution and/or proceeding against Larry Smith.

199.  The above-named individual Defendants caused, initiated, instituted, and/or continued the criminal prosecution and/or proceeding against Larry Smith with malice and/or a purpose other than that of bringing Mr. Smith to justice.

200.  Larry Smith suffered a deprivation of liberty as a result of the criminal prosecution and/or proceeding.

201.  Larry Smith suffered a special injury in the form of a seizure of his person.

202.  The above-named individual Defendants are liable to Larry Smith for treble damages pursuant to Michigan Compiled Laws Annotated 600.2907.

**COUNT VIII:  Michigan State Law – Abuse of Process**
**Against Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski**

203.  Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

204.  The above-named individual Defendants acted with an ulterior purpose in the criminal prosecution and/or proceeding against Larry Smith.

205.  The above-named individual Defendants acted improperly and/or irregularly in the use of process during the criminal prosecution and/or proceeding against Larry Smith.

31

206.   The above-named individual Defendants' abuse of process resulted in damages and injuries to Larry Smith.

**COUNT IX:  Michigan State Law – Intentional Infliction of Emotional Distress Against Defendant Donaldson, Defendant Childs, Defendant Karvonen, Defendant Mueller, Defendant Love, and Defendant Dembinski**

207.   Larry Smith hereby re-alleges and incorporates by reference each of the preceding paragraphs as if fully restated herein.

208.   The above-named individual Defendants engaged in extreme and outrageous conduct.

209.   The above-named individual Defendants acted with intent and/or recklessness.

210.   The above-named individual Defendants' conduct caused severe emotional distress to Larry Smith.

Wherefore the Plaintiff, Larry Smith respectfully requests that the Court enter judgment in his favor and against Defendants, County of Wayne, Robert J. Donaldson, Monica Childs, Gene Karvonen, Roger Mueller, Walter Love, and John Dembinski, awarding compensatory damages, costs, and attorneys' fees against each Defendant, along with punitive damages against each of the individual Defendants, injunctive and equitable relief against Defendant, County of Wayne, as well as any other relief the Court deems appropriate.

Respectfully Submitted,

**Larry Smith**

s/Jarrett Adams
THE LAW OFFICE OF JARRETT ADAMS, PLLC
40 Fulton Street, Floor 7
New York, NY 10038
T: & F: (646) 880-9707
E: JAdams@JarrettAdamsLaw.com
New York State Bar Number 5455712


Pamela L. Campbell
RICE LAW PLLC
23205 Gratiot #303
Eastpointe, MI 48021
T:  (855) 726-5292
E:  Pam.rice.law@gmail.com
Michigan State Bar Number P75243

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January 2022, the above and foregoing has been served electronically on all counsel of record.

s/Jarrett Adams

## **SERVICE LIST**

Allegra Marie Lanni
Email:  amason1@waynecounty.com

Davidde A. Stella
Email: dstella@waynecounty.com

James R. Acho
Email: jacho@cmda-law.com

Shane Robert Nolan
snolan@cmda-law.com

*Attorneys for Defendants*