UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY SMITH,

                    Plaintiff,                      Case Number 21-12070

v.                                                 Honorable David M. Lawson

COUNTY OF WAYNE, ROBERT J.
DONALDSON, MONICA CHILDS, GENE
KARVONEN, ROGER MUELLER, WALTER
LOVE, and JOHN DEMBINSKI,

                    Defendants.

_____/

**OPINION AND ORDER GRANTING WAYNE COUNTY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART
AND DENYING IN PART DETROIT POLICE DEPARTMENT DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Larry Smith filed this lawsuit against Wayne County, one of its assistant prosecutors, and several members of the Detroit Police Department (DPD) alleging that the defendants violated his rights by fabricating evidence to falsely convict him for the 1994 murder of Kenneth Hayes. The county defendants (Wayne County and Robert Donaldson) and the DPD defendants (Monica Childs, Gene Karvonen, Roger Mueller, Walter Love, and John Dembinski) each filed motions for summary judgment. The Court heard oral argument on November 28, 2023. Prosecutor Donaldson enjoys absolute immunity from suit, and Wayne County is released from liability by operation of law by the settlement the plaintiff accepted under Michigan's Wrongful Imprisonment Compensation Act. The county defendants' motion for summary judgment will be granted. The undisputed facts also show that all of the DPD defendants except Monica Childs either have no liability or are entitled to qualified immunity. Their motion for summary judgment, therefore, will be granted in part. The case will continue against defendant Monica Childs.

## I.  Facts and Proceedings

Defendant Monica Childs is a DPD detective who investigated the 1994 homicide of Kenneth Hayes.  Defendants Gene Karvonen, Roger Mueller, Walter Love, and John Dembinski are other DPD police officers who also were involved in the investigation of the murder scene. Collectively they are referred to as the DPD defendants.  Defendant Robert J. Donaldson is a Wayne County assistant prosecuting attorney.  He conducted the prosecution of the defendant for the murder.  The plaintiff alleges that the police officers who investigated the murder scene fabricated evidence and planted evidence at the plaintiff's house when it was searched, and that Detective Childs conspired with assistant prosecutor Donaldson to persuade a witness, Edward Allen, to testify falsely that the plaintiff made a jailhouse confession to the murder.

### A. Conviction and Post-Conviction Litigation

On November 29, 1994, after a jury trial in the Wayne County, Michigan circuit court, plaintiff Larry Smith was convicted of first-degree murder and possession of a firearm during the commission of a felony in the shooting death of Kenneth Hayes, which occurred on March 24, 1994.  He was sentenced to life in prison without the possibility of parole.   The convictions were affirmed on appeal.  *People v. Smith*, No. 183431, 1997 WL 33350497, at *3 (Mich. Ct. App. Apr. 25, 1997), *lv.to app. den. People v. Smith*, 459 Mich. 884, 587 N.W.2d 499 (1998).  The Michigan Court of Appeals summarized the evidence presented at the plaintiff's trial:

> The inculpatory evidence presented at trial included: 1) Sandra Cartwright's testimony that Ursula Jackson told her that Butter (which was [Smith]'s nickname) had shot the victim; 2) Ralph Cartwright's testimony that he saw defendant chasing after the victim and shooting him with [a] gun; 3) Edward Allen's testimony that defendant admitted to him that he shot a person; 4) a footprint found near the scene, which was consistent with a boot print taken from a boot of defendant's; and 5) an empty ammunition box of .40 caliber bullets and a .40 caliber shell found in defendant's home, which matched the .40 caliber shell casings found in the streets and areas surrounding Sandra Cartwright's home.  Additionally, according to Officer Childs' testimony, defendant told her that witnesses could not have seen his face at the crime scene because he was wearing a hood.  That evidence, and all

reasonable inferences drawn therefrom, is sufficient to establish the elements of first-degree premeditated murder.

[The] [d]efendant claims that because the only bullet casing found at his home was a .40 caliber bullet, and the fatal bullet that killed the victim was a .32 caliber bullet, defendant could only have acted as aider and abettor. Defendant argues that there was insufficient evidence of aiding and abetting to permit a first-degree murder charge to go to the jury. . . . [However], Ralph Cartwright testified that he observed Jay Clay driving his Black Honda Accord near the Cartwright house prior to the shooting. Ralph also observed a person enter Clay's car after the shooting. Ralph further testified that Clay and defendant were friends, and he had previously seen them together. Moreover, Edward Allen testified that defendant told him that he and Clay were "rap partners" and that they had been involved in killing a person together.

*Smith*, 1997 WL 33350497, at *3.

Smith filed a post-conviction motion for relief from judgment in December 2003, which was denied, and the denial was affirmed on appeal. *People v. Smith*, 477 Mich. 907, 722 N.W.2d 814 (2006). In July 2007, Smith filed a federal petition for a writ of habeas corpus. *See Smith v. MacLaren*, No. 07-13130 (E.D. Mich.). Twice Smith was allowed to return to state court to raise and exhaust additional challenges to the convictions. He filed second and third motions for relief from judgment in the state trial court, which were unsuccessful, as were his efforts to secure review on appeal. *People v. Smith*, 490 Mich. 872, 803 N.W.2d 330 (2011); *People v. Smith*, 497 Mich. 981, 861 N.W.2d 23 (2015). In June 2015, Smith returned to federal court and filed a third amended habeas petition pleading fifteen grounds for relief, which included arguments that he was actually innocent and that the prosecution used Allen's perjured testimony to convict him. He also argued that other evidence of shell casings was fabricated and that the prosecution introduced false testimony by a second witness, Sandra Cartwright, and failed to correct it. *Smith v. MacLaren*, No. 07-13130, ECF No. 59, PageID.2767-68 (E.D. Mich. Feb. 9, 2017). The habeas petition was denied, and the Sixth Circuit denied Smith a certificate of appealability. *Smith v. Brewer*, No. 17-1741, ECF No. 6-1 (6th Cir. Jan 16, 2018).

### B.  Conviction Integrity Unit Investigation

The Wayne County Prosecutor's Conviction Integrity Unit undertook a reinvestigation of

the case and, after finding that the convictions were unjustly obtained, the prosecutor entered into

a stipulation to vacate the convictions and sentences.  The office issued a press release on February

4, 2021 summarizing the results of the investigation:

> On March 24, 1994, in the early morning hours at a location in the 2200 block of Annabelle in the City of Detroit it was alleged that Mr. Smith killed Kenneth Hayes. During the trial there was no one that testified that they saw the shooter [sic] face. The sole eyewitness identification testimony regarding Mr. Smith as the shooter was based on gait and body shape of a person running away from the scene.  There was never any testimony that established that Mr. Smith had a distinctive gait or body shape.  There was no conclusive forensic evidence that linked Mr. Smith to the case.  There was testimony in the case from a jail house informant claiming that Smith had confessed the murder to him.  The informant was later discredited because it [sic] may have been fabricated to obtain police favors in his case.  Smith denied making any confessions to the informant and has always maintained his innocence.
>
> As a result of the extensive investigation, the Conviction Integrity Unit will move the court to grant the relief of a new trial.  Due to the passage of time it is not possible for the case to be re-tried, so the CIU will request that the Court dismiss all charges against Mr. Smith.  Due to computer issues with the Third Circuit Court there was not a court hearing.  Today Judge Shannon Walker signed the order dismissing all charges against Mr. Smith.  WCPO has been advised that the Michigan Department of Corrections released Mr. Smith this afternoon.

Press Release dated Feb. 4, 2021, ECF No. 102-5, PageID.3502-03.  On the same date, the state

trial court issued an order pursuant to the stipulation of the parties vacating the convictions and

sentences and dismissing the charges.  Order Vacating Convictions and Sentences, ECF No. 102-

7, PageID.3505-06.

### C.  Edward Allen

The prosecution's star witness at the homicide trial was Edward Allen, who testified that

Smith had confessed his involvement in the murder to Allen while the two were cellmates in the

Wayne County Jail.  Allen testified at a deposition that his trial testimony was false and was given

- 4 -

in exchange for favors promised by defendants Childs and Donaldson. Edward Allen dep., ECF No. 116-3. Allen said that in 1994 he was "living at 1300 Beaubien" — the address of the DPD headquarters — while in custody awaiting trial on his own unrelated charges. He elaborated on the arrangement with the Detroit Police Department whereby he came to be housed in the DPD stationhouse rather than at the Wayne County Jail, where inmates awaiting trial typically were held:

> Q. When you say "living at 1300 Beaubien," could you explain to me what you mean by that.
>
> A. Oh, you live in the back. Homicide had a place up there where you can put police witnesses and stuff in the back, or guys they bring down from writs that used to work with them for homicide, you get to live in the back. They give you a TV, radio; you get food, anything you want.
>
> Q. Okay.
>
> A. You don't be like the other prisoners.
>
> Q. And — and was this — you know, was this something that happened with all prisoners on 1300 Beaubien?
>
> A. No, no. You have to be testifying for homicide or the prosecutor office. They'll take you over to you know, downstairs to the 5th Floor and you get like discovery packages. You help them get convictions on guys, you know. They'll tell you exactly, you know, what you need to say like the guy confessed to a crime. They'll let you read it where everything is short, straight to the point. And you get to live there in the jail and they'll help you out with your case and stuff like that.
>
> Q. How did you find out about this — this, you know, this homicide exchange . . . for testimony thing that was going on the 9th Floor at 1300?
>
> A. That's . . . . been going on since the 80s. I was — I was there. I was on the Hart Street murder case. The prosecutor and homicide got me a grant of immunity. A whole family had got killed on Hart Street, and that's how I first met all of them people in 1300 Beaubien. That been going on for years. I was like 16. That's how I met all of them. I used to live up there and then they sent me to the training school, but the prosecutors came over and talked to me and they got me a grant of immunity where I can come testify in — in five murders.

Allen dep. at PageID.4923-24. Allen then recounted his involvement with Smith's case:

Q. Okay. And . . . did you have a chance to work with the prosecutors in any other capacity after that case that you're speaking of, the five homicides?

A. Yeah, '94, when I wrote Monica Childs, they writted me out of the county jail and I told them about the Larry Smith and they wanted Larry and stuff like that. I had never met him. I had met his codefendant and the codefendant had Culpepper [as his lawyer]. I know Culpepper. And he want me to help him and Monica Childs help the codefendant beat the case and get Larry caught up. That's how I end up finding out the information I needed for the Larry case. And I went to court with Monica Childs and Larry got found guilty.

Q. You said you . . . worked with the prosecutors. Did the prosecutors come and see you as well?

A. Yeah, the prosecutors, they come. They got to make sure they can establish — they talk about corpus delicti, and we need to have a solid — solid testimony that — you know, to convict him, the — you know, the guy, the defendant, you know, and they want you to say like he threatened you, he bragged about a murder. You gotta be creative to make it look like, you know, that this guy actually say it, but you already read the discovery package, you know, where you know where the area was at, and stuff like that, just in case. They let you know exactly where the crime happened and, you know, what time and stuff like that. And with Larry's situation, I had to make it look like me and him got into it in the county jail and he threatened me and bragged about he was a killer, and I felt for my life, and I had to write homicide and they came and writted me out over to the 9th Floor.

*Id.* at PageID.4924-26. Allen further testified about defendant Donaldson's involvement in soliciting his testimony:

Q. How about another prosecutor by the name of Robert Donaldson?

A. Now, the Donaldson guy, now, I can — I can remember Donaldson — Donaldson and this other one named McKenzie — Donaldson and a . . . McKenzie, a McKenzie guy.

Q. Okay. And what do you remember about Donaldson?

A. Oh, just sitting in homicide. He — he was one of the prosecutors that used to come over there and sit — sit with them and go over paperwork with them at homicide, or he'll call like some of the other witnesses down that's working on the other cases and stuff like that there. He was kind of popular there.

Q. Did you have any interactions with Robert Donaldson on the Larry Smith case?

A. I talked to him. Yeah, I talked to that joker. That's why I remember him from — because he asked me, "Have I ever seen Mr. Smith?" I said, "No. I ain't never seen him before. We wasn't even on the same rock." I was on the rock with his

codefendant so they showed me pictures of Larry, and they said, "Well, he'll be in the courtroom.  All you got to do is identify him."  They showed me, you know, the — exactly how he was big and stuff like that.  That was my first time seeing him.  I didn't even know him.  The codefendant, we was on the rock together.  His name was Jerry Clay.  That was Larry's codefendant, and that's how I got the information to write homicide to get them to come writ me out from Jerry.  That was his codefendant.  His daddy was a reverend and his lawyer wanted me to help — help him beat the case so Larry can get charged with it.

Q. Did you know anything about the homicide in which Larry Smith and Jay Clay were incarcerated for?

A. Only thing I know what they told me, that they was at a party, and they wanted me to say that Larry supposed to jumped in the car, and somebody supposed to have got shot at a party and, you know, from what his codefendant, Jerry was telling me, you know, what had happened, that's the only thing I had knew.  When I — when I went to testify, I had to make it look like that I was threatened, that Larry bragged about doing the killing, that I'm a killer, I ain't no big — you know, I had to create a story to make it look like, you know, that he actually met me, but he didn't.  I never met him.

Q. And — and when you told the prosecutor, Donaldson, that you had never spoken to Larry, or . . . or saw him, what was his response to you?

A. Oh, he said, "Don't worry about it."  He said that, "All you got to do, we just need you to say that he bragged about it, you know, like the letter you wrote with Monica Childs. You repeat the same thing in case they need to cross-examine you with the letter.  You stated that you were threatened by Larry Smith and he bragged about being a killer, and he's fighting the murder case.  This is him. You tell the court — there's going to be a jury . . . that that's the man threatened you. He gonna be in the courtroom.  This is him."  That's what — and they showed me a picture.

*Id.* at PageID.4929-32.  Allen said that his false testimony about Smith's supposed jailhouse confession was given directly in exchange for help from the police and prosecutors with getting his own charges dismissed:

Q. Can you — can you describe like how — how were you able to get your charges dismissed after testifying against Larry?

A. Oh, I stayed up there for like two years.  I was — I fought it from '93 to '95, and the witness didn't end up coming to court.  The homicide had an investigator go find out that they was doing a car ring and stuff like that there, and they helped — they helped me out.  They had an investigator go and talk to the witnesses, and sure enough, the woman end up — wind up having a warrant for her arrest, and at the day of my trial, she didn't come to court because they put a warrant out for her.

She had tickets and stuff like that, and I was in front of Judge Strong and they dismissed it.  They helped me beat it.

Q. Did they do — did they help you specifically in exchange for the false testimony against Larry Smith?

A. Yeah.  You get to live there, you know; you don't have to worry about all the extra stuff.  They — they take care of you.  They give you everything you need, man.  You know, they tell you, "Don't worry about your case."  They might know the police that's on your case or something like that there.  The main thing is the homicide, so by them being police, they can help you out.  They can get your case postponed and — and all that.

*Id.* at PageID.4932-33.  Finally, Allen recounted his familiarity with other inmates who had engaged in similar testimony-for-favors arrangements with the DPD and prosecutors, including Joe Twilley, who testified falsely in a dozen or more cases.  *Id.* at PageID.4933-36.  Allen said that while he was in residence as a stationhouse informant, he knew of eight other inmates who engaged in similar ongoing arrangements, including persons whom Allen identified as "Hewitt-El" and Milton Jones.  *Id.* at PageID.4938-39.

### D. Other Informants

Smith highlights Allen's testimony, which he says implicated at least three other informants besides Allen who testified falsely in a collective total of at least 31 cases.  Smith further points out public records of the proceedings in cases against several of the informants including Joe Twilley, Olivera Cowan, Ramon Lamar, and Anton Mann, who he says had charges dismissed or sentences reduced based on their cooperation with the prosecution in other criminal matters.

### E. Ballistics Evidence

The plaintiff points out, and the defendants do not dispute, that officers who investigated the scene of the Hayes shooting reported and later testified about finding varying numbers of .40 caliber shell casings at the scene.  Officer Gene Karvonen wrote an evidence technician report and

later testified at trial that seven shell casings were recovered.  Officers Roger Mueller and Walter Love wrote in their own reports and testified that together they recovered five shell casings.  Smith points to another scene report by non-party Officer Erik Cox stating that he found six shell casings.

DPD Officer Keith Chisholm — also not a party to this case — wrote in a report and later testified that during the search warrant execution at Smith's home, he found a spent .40 caliber shell casing in a clothes hamper in Smith's bedroom.  *See* Report dated Mar. 24, 1994, ECF No. 117-6, PageID.5457.  However, DPD evidence records indicate that the shell casing found at Smith's residence was "destroyed" for unknown reasons on May 31, 2006, and the casing therefore no longer is available for further testing.  Evidence Inquiry Report, ECF No. 117-7, PageID.5458.  Officer John Dembinski wrote in a report and testified at trial that during the warrant execution on March 24, 1994, he found an empty box of .40 caliber shell casings on a shelf in Smith's basement bedroom.

At trial, non-party Officer David Pauch opined that the .40 caliber shell casings recovered by the other officers at the Hayes murder scene could have come from the empty box found at Smith's residence.  However, Smith testified at his deposition that there never was any .40 caliber ammunition in his residence, Smith dep., ECF No. 95-2, PageID.1718, and his mother, Debra Smith, testified at the criminal trial that she never saw any .40 caliber ammunition in the home, Trial Tr., ECF No. 97-4, PageID.2480.

It is undisputed that a total of seven shell casings that the defendants reported recovering from the Hayes murder scene remain in evidentiary custody.  Those shell casings were reevaluated by the Michigan State Police Crime Laboratory in 2010, which produced a report identifying all of the items as .40 caliber spent shell casings and concluding that all were fired in the same weapon. Lab Report dated Jan 17, 2010, ECF No. 119-1, PageID.5659.

The plaintiff asserts, and the defendants do not dispute, that the only bullet recovered from Hayes's body was a .32 caliber slug that could not have been fired from a .40 caliber weapon. However, the defendants point out that the medical examiner's trial testimony established that Hayes had two bullet wounds, with one being the fatal wound caused by the .32 caliber bullet, and the other being from a second slug that passed through Hayes's arm and never was found.  Trial Tr., ECF No. 97-2, PageID.2141-46.  The defendants speculate that it is possible that the unrecovered bullet could have been fired by a .40 caliber weapon used by one of two assailants, while the fatal bullet found in Hayes's body was fired by another (also unrecovered) .32 caliber weapon wielded by a different assailant.

## F. Procedural History

On September 3, 2021, the plaintiff filed his complaint in this case, later amending it to plead claims via 42 U.S.C. § 1983 alleging violations of the Fourth and Fourteenth Amendments based on unlawful detention (Count I), evidence fabrication (Count II), malicious prosecution (Count III), civil conspiracy (Count IV), "failure to intervene" (Count V), as well as a *Monell* claim against defendant Wayne County (Count VI), and state law claims for malicious prosecution (Count VII), abuse of process (Count VIII), and intentional infliction of emotional distress (IIED) (Count IX).  The defendants filed motions for summary judgment.

## II.  Summary Judgment Motions

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th

Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

### A.  Wayne County Defendants' Motion for Summary Judgment

The Wayne County defendants argue that all of the claims against them must be dismissed on several grounds.  Two of those grounds are dispositive, however.  They contend that the case against defendant Ronald Donaldson must be dismissed on the ground of absolute prosecutorial immunity.  They also contend that all of the claims against the County must be dismissed because the plaintiff accepted a settlement under the State of Michigan's Wrongful Imprisonment Compensation Act, which constituted by operation of law a full release of "all claims" by him against the State and its political subdivisions.

### 1.  Claims Against Defendant Donaldson

Smith alleges that defendant Donaldson conspired with Detective Monica Childs to violate his due process and Fourth Amendment rights by manufacturing false testimony that Smith was involved in the murder of Keith Hayes.  Smith accuses Donaldson and Childs of procuring false testimony from Edward Allen about a fabricated jailhouse confession to the crime.  Donaldson

pleads absolute prosecutorial immunity, contending that his interactions with Allen amounted to preparing a witness for trial. The plaintiff responds that when Donaldson suborned Allen's perjury, Donaldson was acting in an investigative role, and therefore he is not protected by absolute prosecutorial immunity.

It is well established that a prosecuting attorney enjoys absolute immunity only when that prosecutor acts "as an advocate for the State" and engages in activity that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Those activities include "initiating a prosecution" and "presenting the State's case." *Id.* at 431. Determining when a prosecutor is an advocate and not an investigator calls for application of "a functional approach." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). "This approach looks to 'the nature of the function performed, not the identity of the actor who performed it.'" *Howard v. Livingston County*, No. 21-1689, 2023 WL 334894, at *4 (6th Cir. Jan. 20, 2023) (quoting *Buckley*, *supra*; *Forrester v. White*, 484 U.S. 219, 229 (1988)). "Under the functional approach, 'the official seeking absolute immunity bears the burden of showing that [absolute] immunity is justified for the function in question.'" *Ibid.* (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

"Courts have been 'quite sparing' in extending this immunity to state actors in the § 1983 context." *Ibid.* (citing *Buckley*, 509 U.S. at 269; *Forrester*, 484 U.S. at 224). "The Supreme Court has explained that '[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.'" *Ibid.* (quoting *Buckley*, 509 U.S. at 273). "For example, a prosecutor who 'performs the investigative functions normally performed by a detective or police officer' such as 'searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested' is not entitled to absolute immunity because that immunity

does not protect 'the investigative functions normally performed by a detective or police officer.'"
*Ibid.* (quoting *Buckley*).

The Sixth Circuit has acknowledged that "the line between conduct that is part of a preliminary investigation and conduct that is 'intimately associated with the judicial phase of a criminal proceeding' may be difficult to draw." *Howard*, 2023 WL 334894, at *4 (citing *Burns*, 500 U.S. at 495 ("Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive.")). Again, the focus must be "on the specific conduct at issue," and courts must "determine whether a prosecutor was acting as an advocate for the state, or was simply engaging in preparatory conduct and performing administrative or investigative functions." *Ibid.* (citing *Stockdale v. Helper*, 979 F.3d 498, 302-06 (6th Cir. 2020) (rejecting absolute immunity for personnel action taken by prosecutor); *Rieves v. Town of Smyrna*, 959 F.3d 678, 690-92 (6th Cir. 2020) (denying absolute immunity for conduct prior to initiation of judicial proceedings)).

It is well settled that "[p]reparation of witnesses for trial is protected by absolute immunity." *Spurlock v. Thompson*, 330 F.3d 791, 797 (6th Cir. 2003) (citing *Higgason v. Stephens*, 288 F.3d 868, 877-78 (6th Cir. 2002) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 272-73 (1993) ("We noted in particular [in *Imbler*] that an out-of-court effort to control the presentation of a witness' testimony was entitled to absolute immunity because it was fairly within the prosecutor's function as an advocate." (cleaned up)))). In this case, the entirety of Donaldson's allegedly wrongful conduct, according to the plaintiff, involved discussions with witness Edward Allen in which Donaldson, working with Detective Childs, enticed or coached Allen to provide false testimony that Larry Smith confessed to his involvement in the Hayes murder. It is

- 13 -

undisputed that all of the interactions occurred after the formal charges against Smith were lodged. Every circuit to have considered the question has found that alleged subornation or solicitation of perjured testimony falls on the absolute immunity side of the line when it occurs in the course of interviewing or preparing witnesses during formal criminal proceedings. *E.g.*, *Myers v. Morris*, 810 F.2d 1437, 1447 (8th Cir. 1987) ("Soliciting and suborning perjured testimony does not create liability in damages for a prosecutor acting as an advocate in a judicial proceeding."); *Lee v. Willins*, 617 F.2d 320, 322 (2d Cir. 1980) ("The complaint in the instant case alleges prosecutorial misconduct, including falsification of evidence, and the coercion of perjured testimony from a number of witnesses.") (affirming dismissal based on absolute immunity); *Heidelberg v. Hammer*, 577 F.2d 429, 432 (7th Cir. 1978) ("[C]harges that the prosecutors induced witnesses to commit perjury are barred by the immunity doctrine.").

That is not so when solicitation of perjured testimony occurs during a timeframe before or after the formal judicial proceedings. *Holloway v. Brush*, 220 F.3d 767, 798-99 (6th Cir. 2000) (*en banc*). However, where the interaction is "closely associated with the judicial process" the immunity defense prevails. *Burns*, 500 U.S. at 495. In cases where the defense was found not to apply, it was, for example, where, long after a formal prosecution had concluded, a prosecutor threatened a witness to stick to the narrative given in perjured trial testimony, under pain of perjury charges. *E.g.*, *Spurlock*, 330 F.3d at 798-99. In this case, however, there are no such allegations of any involvement by Donaldson either before or after the formal criminal proceedings against Smith were underway.

The allegations about the conduct of Donaldson and Childs are disturbing, to be sure. If Allen is to be believed, the police and prosecutor's office were engaged in practices that certainly were grossly unethical and likely criminal. *Price v. Montgomery Cnty., Ky.*, 72 F.4th 711, 719

- 14 -

(6th Cir. 2023) (observing that "immunity from suit does not immunize badly behaving prosecutors from other forms of accountability — they can be subjected to court sanctions, removal from office, and criminal charges, among other ramifications") (citing *Imbler*, 424 U.S. at 428-29).  But well-established precedent shields Donaldson's alleged acts from a suit for civil damages, and so Smith's section 1983 claim against him must be dismissed.

Likewise, to the extent that the claims are premised on any failure to disclose exculpatory evidence, absolute immunity also applies.  "[P]rosecutors maintain their immunity when intentionally failing to disclose exculpatory evidence."  *Price*, 72 F.4th at 720 (citing *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010)).  There are no allegations of any prosecutorial withholding occurring in this case beyond the scope of the formal criminal proceedings.

For similar reasons, Smith's state law claims against Donaldson must be dismissed.  Michigan courts applying governmental immunity to damage suits against prosecuting attorneys generally track the federal law of absolute prosecutorial immunity.  *See Davis v. Eddie*, 130 Mich. App. 284, 287, 343 N.W.2d 11, 13 (1983) (citing *Imbler v. Pachtman*, 424 U.S. at 409).  And when applying Michigan's Governmental Tort Liability Act, Michigan courts have held that executive officials enjoy "absolute" immunity when exercising executive authority.  *Trendell v. Hackel*, No. 345520, 2019 WL 4389172, at *3 (Mich. Ct. App. Sept. 12, 2019) (citing *Petipren v. Jaskowski*, 494 Mich. 190, 203, 833 N.W.2d 247, 254 (2013); *Ross v. Consumers Power Co.* (*On Rehearing*), 420 Mich. 567, 633, 363 N.W.2d 641, 668 (1984)).

### 2.  Claims Against Wayne County

Michigan law gives those who have been convicted and sentenced to prison wrongfully a route to obtain compensation from the state.  Mich. Comp. Laws § 691.1751 *et seq.* (the Wrongful Imprisonment Compensation Act, or WICA).   Under that law, a person who qualifies for

compensation may recover "[f]ifty thousand dollars for each year from the date the plaintiff was imprisoned until the date the plaintiff was released from prison." Mich. Comp. Laws § 691.1755(2)(a). A person accepting an award or settlement under the act, by operation of law, "releases . . . all claims against this state . . . based on the same subject matter" that caused the wrongful imprisonment. But it does not prevent "any action in federal court against an individual alleged to have been involved in the investigation, prosecution, or conviction that gave rise to the wrongful conviction or imprisonment." Mich. Comp. Laws § 691.1755(8). The act defines "this state" to mean "the state of Michigan and its political subdivisions." Mich. Comp. Laws § 691.1752(e).

Smith accepted a settlement under the act in the amount of $850,000. Wayne County argues that accepting the settlement operates as a release and forecloses all claims against it for the wrongful conviction and imprisonment. Smith counters that his WICA settlement agreement did not release his claims against the County, because it expressly stated that "Plaintiff's award is subject to the protections and limitations described in MCL 691.1755(9)-(13)," excluding any reference to the statutory claim release language in section 691.1755(8), on which the defendants rely. The plaintiff contends that because his agreement did not mention subsection 8, none of his claims against the County were released under that section of the law.

The plaintiff's argument faces several obstacles. For one, the language the plaintiff references is found in a state court order that was entered in a case involving someone other than Smith. *See* Wayne Cnty. Defs' Mot. Summ. J., Ex. O, Stipulated Order of Judgment, ECF No. 103-16, PageID.4415-17 (referring to "Ramon Lamar Ward" as plaintiff). The Release and Settlement Agreement in Smith's WICA case makes no reference to "the protections and

limitations described in MCL 691.1755(9)-(13)" or to any other part of section 691.1755.  *See* Pl.'s Resp. to Mot. Summ. J., Ex. E, ECF No. 116-6, PageID.5057-60.

Even if we were to look at the language in the order in Ward's case, there is no language there or in any documents presented to the Court suggesting that the "state" or "its political subdivisions" waived their rights under subsection 8.  There is no dispute that the award to Smith was conferred under the authority of the WICA.  The plaintiff's insistence that his quoted (but inapplicable) language can cause the state's waiver by negative implication of the release of liability in subsection 8 finds no support in the jurisprudence.

The statute itself does not require much interpretation, but even if it did, the Court begins "with the plain meaning of the statutory language." *King v. Zamiara*, 788 F.3d 207, 212 (6th Cir. 2015) (citing *Walker v. Bain*, 257 F.3d 660, 666 (6th Cir. 2001)).  "[I]f [the] language [of the statute] is clear and unambiguous, the Court will usually proceed no further." *United States v. Bailey*, 228 F.3d 637, 638 (6th Cir. 2000) (citing *Barker v. Chesapeake & Ohio R.R.*, 959 F.2d 1361, 1366 (6th Cir. 1992).  The plain language of the statute states that "*[t]he acceptance by the plaintiff of an award under this act*, or of a compromise or settlement of the claim . . . *constitutes a complete release of all claims against this state*." (emphasis added).  There is no dispute that the plaintiff "accepted" an award of compensation when he executed an agreement to settle his claims under the statutory framework.  The statute plainly provides that such an acceptance "constitutes a complete release of all claims" against the state.  The plaintiff has not cited any legal authority endorsing a contrary reading.  The statutory terms expressly define "this state" to include political subdivisions such as the County.  There is no ambiguity in any of those provisions.

Other district courts in this circuit have considered the same question and readily concluded that the plain language of the WICA statute bars *Monell* claims against a Michigan county where

- 17 -

the plaintiff previously accepted an award of compensation under the state law. *E.g.*, *Deering v. Oakland County*, No. 22-11809, 2023 WL 5808831, at *5 (E.D. Mich. Sept. 7, 2023) ("WICA was designed to effectuate the release of all claims — federal and state — against the state, but without an express limitation on federal court jurisdiction."); *Clark v. Abdallah*, No. 21-10001, 2023 WL 4851410, at *2 (E.D. Mich. July 28, 2023) ("The Court finds that Plaintiffs voluntarily waived their right to sue [the City of Inkster] in federal court when they entered into stipulated WICA agreements."); *DeJesus v. Harvey*, No. 22-12879, 2023 WL 4372682, at *4 (E.D. Mich. July 6, 2023) ("[T]he Court reads the WICA as precluding a WICA-awarded plaintiff from suing the state or any of its political subdivisions in federal court. Plaintiffs thus cannot advance a *Monell* claim against the County."). The plaintiff has cited no decisions holding to the contrary. His claims against the County are barred by operation of subsection 8.

### B. DPD Defendants' Motion for Summary Judgment

The DPD defendants contend that Smith's case must be dismissed for a variety of reasons. First, they contend that the Court lacks subject matter jurisdiction because of a defect in the state court proceedings that resulted in the dismissal of Smith's criminal case. They present other arguments premised on the idea that the state court proceedings were not terminated in the plaintiff's favor. They also argue that the plaintiff is barred from "relitigating" issues that were raised and decided in the state criminal and federal collateral proceedings. Some of the claims, they say, are barred by statutes of limitations. They also argue that claims based on false arrest, detention, fabrication of evidence, and malicious prosecution cannot succeed because there is sufficient probable cause of the plaintiff's guilt of the murder. Some of the DPD defendants assert that there is no evidence that they were involved in procuring Edward Allen's false testimony. They all contend that there is no record evidence to support a civil conspiracy, and there is no

evidence of a failure to intervene.  And the DPD defendants all seek the benefit of qualified immunity.  The plaintiff disputes all of these arguments, as discussed below.

### 1. Subject Matter Jurisdiction

The defendants begin with the novel argument that that the Court "lacks jurisdiction" over the case because the order vacating the plaintiff's conviction and sentence was an "ultra vires act" by the state court, since it was entered based on a stipulation by the parties and not in response to a "motion" filed by either the defendant or the prosecution. They also argue relatedly that the proceedings against the plaintiff were not "favorably terminated" because the charges against him were "dismissed without prejudice" based on the parties' stipulation, and theoretically the prosecution could be resurrected at any time by the state prosecutor.

The second argument is untenable after the Supreme Court's decision in *Thompson v. Clark*, 596 U.S. 36, 142 S. Ct. 1332 (2022), where the Court held that "[t]o demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction," *id.* at 1335.  That fact is undisputed on the instant record.

The first argument is based on the undisputed fact that the state trial court issued an order pursuant to the stipulation of the parties vacating the convictions and sentences and dismissing the charges.  Order Vacating Convictions and Sentences, ECF No. 102-7, PageID.3505-06.  That order never has been reversed, vacated, set aside, or even challenged on appeal, nor has any collateral attack on the order ever been mounted by any party in a state forum.  It is well settled that a federal court must afford the state court's final order of dismissal the same conclusive effect that would be given to it by the state courts.  28 U.S.C. § 1738; *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015) ("'State-court judgments are given the same preclusive effect under the

- 19 -

doctrines of res judicata and collateral estoppel as they would receive in courts of the rendering state.'") (quoting *Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011)).  The defendants have not cited any decisional law supporting their innovative argument that such an order would not be regarded with fully final and conclusive effect by Michigan courts.

The defendants also contend that the state court's order was procedurally irregular and should be disregarded because it was issued based on presentation of a "stipulation" rather than a "motion."  However, they have not cited any legal authority for the proposition that this Court has any power to review or nullify the final order of a state court invalidating a criminal conviction. To the contrary, it is well settled that federal district courts generally have no authority to entertain appellate review of state court judgments, which is a prerogative exclusively reserved to the Supreme Court.  *See Fowler v. Benson*, 924 F.3d 247, 254 (6th Cir. 2019) ("*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), hold that only the Supreme Court may review judgments entered by state courts in civil litigation."); *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012) (same, citing 28 U.S.C. § 1257 and *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005)).

The defendants argue that the vacation of the conviction was an "ultra vires act," but "a state officer may be said to act ultra vires only when he acts without any authority whatever." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 736 (6th Cir. 2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)) (cleaned up).  "The test to determine whether a state official has acted ultra vires is whether the state official had a colorable basis for the exercise of authority."  *Ibid*.  It is undisputed that the Michigan Court Rules grant authority to a state court to vacate or set aside a criminal judgment after the conclusion of direct appeal under Michigan Court Rule 6.501 *et seq*.

The commentary to Michigan Court Rule 6.501 clearly indicates that the procedural hurdles established in that chapter of the state court rules cabin *the right of a defendant* to present a motion for relief from judgment.  Mich. Ct. R. 6.501 cmt. ("New Subchapter 6.500 establishes a procedure for postappeal proceedings challenging criminal convictions.  It provides the exclusive means to challenge convictions in Michigan courts *for a defendant* who has had an appeal by right or by leave, who has unsuccessfully sought leave to appeal, or who is unable to file an application for leave to appeal to the Court of Appeals because 18 months have elapsed since the judgment."). Nothing in those provisions or elsewhere in the Michigan Rules of Court constrains a state trial court's authority in the first instance to vacate or set aside its own judgment of conviction. Moreover, even if some procedural error occurred when the conviction was vacated based on a stipulation rather than a "motion," Michigan courts readily recognize the fundamental distinction between errors in the exercise of valid jurisdiction and actions taken in the absence of jurisdiction to act in the first instance.  *Buczkowski v. Buczkowski*, 351 Mich. 216, 222, 88 N.W.2d 416, 419 (1958) ("There is a wide difference between a want of jurisdiction in which case the court has no power to adjudicate at all, and a mistake in the exercise of undoubted jurisdiction *in which case the action of the trial court is not void although it may be subject to direct attack on appeal*.  This fundamental distinction runs through all the cases.") (emphasis added).  Applying that basic principle leads inevitably to the conclusion that there is no legal ground for this Court to hold that the act of a state trial court of general jurisdiction in vacating its own judgment was done "without any authority whatever," regardless of whatever procedural missteps may have occurred on the way to entry of the dispositive order.

The defendants also attempt to invoke the doctrine of *Heck v. Humphrey* as a bar to this civil suit.  However, that rule of law has no applicability where there is no longer any outstanding

criminal judgment, and where the plaintiff is not presently confined under state authority. The line of cases that follow *Heck*, when "taken together," establish a bar to section 1983 cases only "if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). The underlying basis for the holding in *Heck* is that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Heck v. Humphrey*, 512 U.S. 477, 486 (1994). There is no authority for the proposition that the *Heck* doctrine has any applicability where the criminal judgment has been vacated by the state court.

On identical facts, other courts in this district uniformly have concluded that any supposed procedural error in the state court's invalidation of its own judgment of conviction was not an obstacle to suit by a liberated plaintiff under section 1983. *Ansari v. Jimenez*, No. 20-10719, ECF No. 80, PageID.1977-78 (E.D. Mich. Oct. 31, 2022) (Order Denying Mot. to Dismiss) ("[P]rong two [of the *Heck* rule] is not met because the State court's conviction and sentence of Plaintiff was vacated. And 'lower federal courts possess no power whatever to sit in direct review of [S]tate court decisions.'") (citing *Feldman*, 460 U.S. at 482 n.16; *Exxon Mobil Corp.*, 544 U.S. at 292 *Hall v. Callahan*, 727 F.3d 450, 454 (6th Cir. 2013)). The law compels the same result here.

## 2. Statute of Limitations

The defendants argue that the plaintiff's claims all are barred by the applicable two-year or three-year statutes of limitations, because they purportedly accrued on the date of his arrest in 1994. This lawsuit was file September 3, 2021.

In Michigan, a three-year statute of limitations applies to federal claims brought under 42 U.S.C. § 1983. *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009). The date on which a section 1983 claim accrues is determined by reference to federal law and in accordance with common-law tort principles. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "Under those principles, it is the

standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Ibid.* (internal citations, quotations marks, and brackets omitted). That rule was complicated, however, by the Supreme Court's earlier decision in *Heck v. Humphrey*, which held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." 512 U.S. at 489-90. The conviction is invalidated when it "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 487.

Here, the malicious prosecution claim is timely because it was filed within three years after the criminal proceedings terminated in the plaintiff's favor, when the trial court issued its order vacating the conviction and dismissing the case on February 4, 2021. *See King v. Harwood*, 852 F.3d 568, 579 (6th Cir. 2017). "Because an 'element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused,' the statute of limitations in such an action does not begin to run until 'the plaintiff knows or has reason to know of' such favorable termination." *Ibid.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *Eidson v. State of Tenn. Dept. of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007)). The same can be said of the plaintiff's other claims, such as intentional infliction of emotional distress, since he was convicted and success on his claims would imply the invalidity of the convictions. *See Kucharski v. Leveille*, 526 F. Supp. 2d 768, 774 (E.D. Mich. 2007).

### 3. Collateral Estoppel

The defendants argue that the plaintiff is barred from "relitigating" all of the issues raised in the present suit because they all were raised and decided during the prior state court criminal proceedings, and the plaintiff has not been "exonerated" from that conviction, but merely "released

for retrial," barring him from relitigation of questions previously presented to and decided by the state courts.  But under the doctrine of *res judicata*, or claim preclusion as it also is known, "a final judgment on the merits" is required before "the parties or their privies [are precluded] from relitigating issues that were or could have been raised in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

The defendants' arguments that *res judicata* or collateral estoppel bars the plaintiff from "relitigating" factual and legal issues such as the existence of probable cause or the "credibility of witnesses" is without merit because, as discussed above, the judgment of conviction in the state court criminal case was vacated, and that judgment therefore has no preclusive effect.  *Sanford v. Russell,* 381 F. Supp. 3d 905, 924 (E.D. Mich. 2019), *aff'd*, 815 F. App'x 856 (6th Cir. 2020) ("[T]he judgment of conviction was vacated by the stipulation of the parties after evidence of the plaintiff's innocence came to light, so it no longer has any preclusive effect on anything, regardless of what determinations it rested upon.").

4. Probable Cause

The defendants argue that the unlawful detention, false arrest, and malicious claims must fail because a determination of probable cause for the arrest and detention was made at the preliminary examination, and the plaintiff is barred from relitigating the question whether probable cause existed.  The defendants further argue that the determination of probable cause did not hinge on any of the allegedly false or fabricated information in the investigation reports.  That state court probable cause determination, they say, is a key component of their qualified immunity defense.

The plaintiff argues at some length in an attempt to distinguish his claim of "unlawful detention pursuant to legal process" from a claim of "false arrest" or "false imprisonment." However, the Sixth Circuit has rejected such distinctions and held instead that the Fourth Amendment provides a cause of action that embraces all of those various types of violations under

the generalized rubric of malicious prosecution without probable cause.  The court of appeals has clarified that "the Fourth Amendment does not adopt separate bans on 'false arrests,' 'false imprisonments,' and 'malicious prosecutions.'  It establishes a singular ban on 'unreasonable' 'seizures.'"  *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160-61 (6th Cir. 2021) (quoting U.S. Const. amend. IV). "And the Supreme Court has held that this uniform ban bars all pretrial detentions without probable cause to believe that a detainee has committed a crime — whether or not the detention comes before or after formal 'legal process' (like an arrest warrant or an indictment)." *Id.* at 1161. "False arrest, false imprisonment, and malicious prosecution are instead common-law torts," which "[t]he Supreme Court has sometimes relied on . . . not to interpret the Fourth Amendment, but to establish the rules for § 1983 claims." *Ibid.* "[F]alse-arrest-and-imprisonment claim[s] and [] malicious-prosecution claim[s] are thus specific versions of a general unreasonable-seizure claim alleging the same constitutional theory: that the officers seized [the plaintiff] without probable cause." *Ibid.*

The elements of a Fourth Amendment malicious prosecution claim are "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quotations omitted). "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Ibid.*

The claims in this case are not premised merely on absence of insufficiency of evidence constituting probable cause.  Instead, the plaintiff alleges that the prosecution against him was

constructed upon an unlawful admixture of false with legitimate evidence that all together purportedly associated the plaintiff with the murder scene. Probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (citing *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005). An officer "is entitled to qualified immunity [against a claim of arrest or detention without probable cause] if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Everson v. Leis*, 556 F.3d 484, 499 (6th Cir. 2009) (citations omitted). However, the claim may proceed, even if an arrest is based on a facially valid warrant issued by a magistrate, where the plaintiff can prove that the arresting officer "'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Sykes*, 625 F.3d at 305 (quoting *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000)). In other words, the legitimate evidence offered in support of probable cause can be contaminated by the phony, concocted information, which spoils the totality of the presentation.

In this case, there is sufficient evidence both to suggest that defendant Monica Childs made false statements and solicited false testimony that was material to the probable cause determination, and to suggest that if the corpus of allegedly manufactured evidence against the plaintiff is excised, there was no probable cause to maintain the prosecution. First, the plaintiff has testified that, contrary to Childs's attestations, he never told her that witnesses at the murder scene could not have seen his face because he was wearing a hood — which Childs relied upon as an admission that he was present at the scene. Second, Edward Allen testified that Childs and Donaldson solicited his false testimony that Smith confessed his involvement in the murder during

a confrontation while Smith and Allen were confined together at the Wayne County Jail.  Third, it is undisputed that a .40 caliber shell casing purportedly recovered from Smith's residence was reported to have been "destroyed" in 2006, without any explanation by the defendants.  It would be reasonable for a jury to infer based on that revelation that the shell casing either never existed, or that, contrary to testimony that was admitted at trial, it did not in fact implicate the plaintiff in the shooting.

Leaving aside the plaintiff's purported admission, Allen's allegedly false testimony, and the phantom shell casing, there is no evidence apparent in the record suggesting that the plaintiff was in any way connected to the crime scene.  As the CIU report conspicuously noted, "The sole eyewitness identification testimony regarding Mr. Smith as the shooter was based on gait and body shape of a person running away from the scene," and "[t]here was never any testimony that established that Mr. Smith had a distinctive gait or body shape."  Press Release dated Feb. 4, 2021, ECF No. 102-5, PageID.3502-03.  A jury reasonably could conclude that there was no probable cause for his arrest, once those significant items of allegedly false proof are disregarded.  At the very least, Childs's allegedly false statement about Smith's admission and the false testimony from Allen that she allegedly procured certainly were material to the probable cause finding.  The malicious prosecution claim (and related false arrest and detention claims) therefore may proceed notwithstanding the existence of other information that may have contributed to the finding of probable cause.

### 5. Fabrication of Evidence

A key component of Smith's due process claim against the DPD defendants is that the critical evidence against him was fabricated by the police and prosecutor.  "'It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.'"

*Jacobs v. Alam*, 915 F.3d 1028, 1042 (6th Cir. 2019) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)).  "'[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'"  *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("[T]he presentation of testimony known to be perjured . . . to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.")).

Unlike the malicious prosecution claim, the separate claim of evidence fabrication need not be premised on an absence of probable cause.  "[E]ven if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect."  *Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015) (emphasis added).  A claim of fabrication of evidence under the Due Process Clause "does not require a conclusion that the state did not have probable cause to prosecute the claimant."  *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).

The DPD defendants argue that they are entitled to qualified immunity on this claim.  When the qualified immunity defense is raised in a motion for summary judgment, courts must weave the summary judgment standard into each step of the qualified immunity analysis.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The plaintiff is obliged to demonstrate with evidence in the record both that the challenged conduct violated a constitutional right and that the right was clearly established at the time.  *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).  "If the plaintiff fails to establish either element, the defendant is immune from suit."  *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014).  But under the

summary judgment standard, the Court must view the facts in the light most favorable to the plaintiff, *Saucier v. Katz*, 533 U.S. 194, 201 (2001); "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *Scott*, 550 U.S. at 378. The Court must consider separately each officer's entitlement to qualified immunity. *Brown v. Knapp*, 75 F.4th 638, 647 (6th Cir. 2023) (quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam)).

### a. Defendants Karvonen, Mueller, Love, Dembinski

The evidence of evidence fabrication against defendants Karvonen, Mueller, Love, and Dembinski is lacking in substance. There is no evidence in the record suggesting that any of those defendants had any involvement in soliciting false testimony or that they had any hand in interrogating the plaintiff. Instead, the record shows only that these named DPD defendants were involved in processing the Hayes murder scene, and that they testified about the collection and identification of the .40 caliber shell casings that were retrieved from the scene. Conspicuously absent from the record is any specific testimonial or documentary evidence suggesting that any of the testimony by these defendants about the ballistics evidence was false. The plaintiff has proffered no expert testimony impeaching the ballistic analysis of the casings from the murder scene, nor has he presented any other testimony or any tangible information suggesting that the shell casings either did not exist or did not bear any of the identifying characteristics about which these defendants testified.

The plaintiff points out that the number of shell casings found at the scene was reported inconsistently by some of the defendants. There is nothing sinister about that, however. No one ever suggested that each of the defendant police officers who canvassed the scene found all of the

shells.  That some of them may have found more or less than others does not support an inference of evidence fabrication.

Notably, only one of the DPD defendants allegedly was involved in the execution of a search warrant at the plaintiff's residence, where defendant Dembinski reported (allegedly falsely) that he found an empty box of .40 caliber ammunition.  However, again, there has been no evidence presented suggesting that the empty ammunition box either did not exist or was not associated with .40 caliber ammunition.

The plaintiff homes in on the .40 caliber shell casing that DPD Officer Keith Chisholm — not a party to this case — reported that he found at the plaintiff's residence, which allegedly inexplicably was "destroyed" in 2006.  Chisholm is not among the named defendants in this case, and there has been no evidence to suggest that any of the other named DPD defendants had any hand either in Chisholm's allegedly bogus recovery of the phantom shell casing, or that any were involved in its subsequent destruction.

The plaintiff relies on nothing more than speculation that because he was wrongfully convicted, all of the ballistics evidence against him must have been "fabricated."  However, there is no evidentiary support for that claim, other than as it concerns the destroyed shell casing supposedly retrieved from the plaintiff's home.  It is axiomatic that in order to recover against an individual defendant under section 1983, the plaintiff must prove that the defendant's "own individual actions [] violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  The plaintiff has failed to establish individualized liability for the named DPD defendants (except Childs), because there is no evidence that the defendants named in this suit had any personal involvement with either the discovery of the mysterious shell casing or its eventual disposition.

Whether addressing the qualified immunity defense, or simply supporting the elements of his claim, the plaintiff has the burden to establish a constitutional violation with evidence in the record. *Cahoo v. SAS Inst., Inc.*, 71 F.4th 401, 406 (6th Cir. 2023) (holding that plaintiffs "must substantiate their theories on both qualified immunity prongs with record support"). The plaintiff has not produced evidence showing that defendants Karvonen, Mueller, Love, or Dembinski violated his constitutional rights under either the Due Process Clause or the Fourth Amendment. They are entitled to summary judgment.

### b. Defendant Monica Childs

Defendant Monica Childs presents a different story. There is abundant evidence in the record, which, if believed, easily shows that Childs fabricated critical incriminating evidence offered at trial against Smith and conspired with Donaldson to do so.

As discussed above, the plaintiff has testified that he never made any statements to defendant Childs about wearing a hood that would have concealed his identity from anyone at the murder scene. Childs's statements and testimony to the contrary allegedly were false. Moreover, Edward Allen testified that Childs visited him while he was "in residence" as an informant for the Detroit Police Department, and that defendants Childs and Donaldson solicited Allen to testify falsely that Smith had confessed his involvement in the Hayes murder. Pl.'s Resp. to Mot. Summ. J., Ex. B, Allen dep., ECF No. 116-3, PageID.4924-26, 4929-32. Allen further testified that Childs supplied the discovery package from Smith's case so that he would be able to testify accurately about details of the case, despite the fact that he never had met Smith and did not know anything about the Hayes murder. *Ibid.* Allen also said that his false testimony was given directly in exchange for favors from Childs and Donaldson, including assistance with having charges against Allen dismissed. *Id.* at PageID.4932-33. That testimony suffices to sustain the claim that Childs

manufactured evidence against Smith by soliciting and directing Allen's false testimony, which denied the plaintiff his due process rights.

For similar reasons, there is sufficient evidence in the record to sustain a claim of malicious prosecution against Childs.  Contrary to her position, an investigator is not absolved from a malicious prosecution claim merely because there was other legitimate evidence that could have sufficed to form probable cause, because a defendant can be held liable where the fabricated evidence was material to the probable cause determination.  *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) ("To establish that [the defendants] acted in an objectively unreasonable fashion in continuing Plaintiff's detention, Plaintiff must present evidence that the officers (1) stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause.").  Childs's false testimony and Allen's false testimony, which she allegedly instigated, unquestionably were material to the basis of probable cause.  Moreover, as the Sixth Circuit explained in *Stemler*, the absence of probable cause is not a prerequisite for a malicious prosecution claim based on fabricated evidence.  126 F.3d at 871-72.

Defendant Childs is not shielded by qualified immunity from the plaintiff's due process and Fourth Amendment claims.  The Sixth Circuit has recognized since at least 1994 that a criminal suspect has a clearly established right under the Due Process Clause not to be charged and convicted by the State based on fabricated evidence.  *Id.* at 872 (6th Cir. 1997) (collecting cases).  "A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant."  *Ibid.*  The record in this case suggests that Childs reported falsely about admissions she said the plaintiff made to her, while the plaintiff says that he never made any such statements.  The evidence also suggests that Childs actively solicited false

testimony by witness Edward Allen, who testified that he knew nothing about the Hayes murder beyond what he learned from investigative materials that Childs supplied to him.  Subsequent testimony and involvement in any formal proceedings by Childs does not insulate her pretrial investigative conduct from liability.  *Gregory*, 444 F.3d at 738-39; *id.* at 741-42.

Similarly, an individual has "a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute'" that individual."  *Stillwagon v. City of Delaware, Ohio*, 747 F. App'x 361, 371 (6th Cir. 2018) (quoting *King v. Harwood*, 852 F.3d 568, 582-83 (6th Cir. 2017)).  That is because "a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures."  *Spurlock*, 167 F.3d at 1006.

Defendant Childs is not entitled to summary judgment on the plaintiff's federal claims.

### 6. Civil Conspiracy

The defendants argue that the civil conspiracy claim must be dismissed because the plaintiff has not alleged any facts or brought forth evidence to show that any of them participated in a singular scheme to convict him wrongfully, and because a civil rights conspiracy claim cannot be maintained where all of the free-standing constitutional claims must be dismissed.  That argument fails as to defendant Childs.

Section 1985 of Title 42 addresses conspiracies to interfere with civil rights.  A civil conspiracy is "'an agreement between two or more persons to injure another by unlawful action.'"  *Barkovic v. Att'y Grievance Comm'n*, 289 F. Supp. 3d 833, 843 (E.D. Mich. 2017) (quoting *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011)).  To state a claim of conspiracy under section 1985, the plaintiff must allege (1) that a single plan existed; (2) that the alleged conspirators shared in the general conspiratorial objective to deprive the plaintiff of his constitutional or federal

statutory rights; and (3) that an overt act was committed in furtherance of the conspiracy that caused injury. *Ibid.* (citing *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). "[C]onspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009) (citing *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).

There is sufficient evidence in this record from which a jury could conclude that defendant Childs conspired with defendant Donaldson to solicit and coach false testimony by Edward Allen. Allen testified that both of those defendants visited him and discussed soliciting his testimony against Smith, both defendants offered information about the case that was provided for the purpose of making Smith's testimony more believable, and both offered favors in return for Allen's agreement to testify, including relocating him to DPD facilities where he could receive more favorable privileges than he would in jail, and helping him to have charges resolved. From the coordination of their actions toward the same end, involving the same witness, and the additional circumstance that both Donaldson and Childs had obvious motivations to secure a successful prosecution of the plaintiff, a jury reasonably could infer that they acted with a common purpose, based on a single agreed upon plan to violate Smith's rights. Notwithstanding the fact that the claims against Donaldson must be dismissed on the basis of absolute immunity, "evidence of acts by non-party co-conspirators is admissible to establish a defendant's liability, as long as independent evidence is introduced to establish the existence of the conspiracy" *Santana Prod., Inc. v. Sylvester & Assocs., Ltd.*, No. 98-6721, 2006 WL 7077215, at *11 (E.D.N.Y. Nov. 13, 2006), *aff'd*, 279 F. App'x 42 (2d Cir. 2008) (citing *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229 (1917)).

### 7. Intentional Infliction of Emotional Distress

To prove a claim for intentional infliction of emotional distress under Michigan law, a plaintiff must demonstrate that (1) the defendant's conduct was extreme and outrageous, (2) the plaintiff suffered severe emotional distress, (3) there is a causal nexus between the defendant's conduct and the plaintiff's emotional distress, and (4) the defendant intended to or was reckless in causing severe emotional distress. *Lucas v. Awaad*, 299 Mich. App. 345, 359, 830 N.W.2d 141, 149 (2013). Typically, though, an officer who merely executes an arrest supported by probable cause cannot be held liable for intentional infliction of emotional distress. *Walsh v. Taylor*, 263 Mich. App. 618, 634, 689 N.W.2d 506, 517 (2004) (holding that because the officer established probable cause to arrest the plaintiff, "as a matter of law he cannot be liable for intentional infliction of emotional distress."). However, for the reasons discussed above, there is sufficient support for a finding that there was no probable cause to arrest the plaintiff absent the evidence that allegedly was fabricated by Childs and Donaldson to sustain the prosecution. Other federal courts have held that a viable claim for IIED is made out where the defendant procured an arrest and ensuing charges knowingly based on false or fabricated evidence. *E.g.*, *Bickerstaff v. Cuyahoga County*, No. 18-01142, 2019 WL 7500494, at *23 (N.D. Ohio Aug. 12, 2019), *R&R adopted*, 2019 WL 5303967 (N.D. Ohio Oct. 21, 2019). The evidence here creates a material fact question that precludes summary judgment in defendant Childs's favor on this count.

### 8. Failure to Intervene

This theory of liability generally has been applied in cases involving the use of force, where an officer at the scene allegedly witnessed and failed to make any effort to halt physical abuse of a suspect by another officer. *E.g.*, *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). However, although the court of appeals has "found that officers could be held liable under § 1983 for standing by idly while other officers

repeatedly beat and kicked a suspect and dragged him down an alley," it "also [has] made clear . . . that officers cannot be held liable under this theory if they do not have 'a realistic opportunity to intervene and prevent harm.'" *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (quoting *Ontha v. Rutherford County*, 222 F. App'x 498, 507 (6th Cir. 2007)).

The plaintiff has presented no developed argument in support of this claim. And even assuming that a "failure to intervene" theory could apply in the context of the claims presented by this case, the plaintiff has failed to present any evidence that defendant Childs either was aware of improper conduct by any other named defendant or had a reasonable opportunity to prevent the same. The Sixth Circuit generally has held that liability on a failure to intervene theory may attach where "the officer observed or had reason to know" that a constitutional violation was in progress, and (2) "the officer had both the opportunity and the means to prevent the harm from occurring." *Floyd*, 518 F.3d at 406 (quoting *Turner*, 119 F.3d at 429).

None of the defendant DPD line officers were in a position to prevent Childs's fabrication of evidence. And Childs certainly would not have intervened to prevent her own unlawful conduct. The plaintiff's failure-to-intervene theory does not fit the facts of the case. The DPD defendants are entitled to summary judgment on this count.

### 9. Abuse of Process

To state a claim for abuse of process under Michigan law, a plaintiff must plead facts showing "(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 412 Mich. 1, 30, 312 N.W.2d 585, 594 (1981). For an abuse-of-process claim, the misconduct "is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." *Id.* at n.18 (quoting Restatement (Second) of Torts § 682 cmt. a (1977)). An "action

for the abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Spear v. Pendill*, 164 Mich. 620, 623, 130 N.W. 343, 344 (1911) (quotation marks omitted).

This claim must be dismissed against the DPD defendants because there is no evidence — nor even any suggestion — that defendant Childs or any of the other police officers had any involvement with any "use of process" in the criminal prosecution other than the initiation of the charges based on Childs's investigation materials and initial criminal complaint. The plaintiff has put forth no evidence suggesting that the DPD defendants had any involvement in any "improper use of process" after the criminal proceedings commenced.

### III.  Conclusion

Defendant Donaldson is entitled to absolute prosecutorial immunity, and all of the claims against Wayne County are barred by the release of claims which occurred by operation of law when the plaintiff accepted a settlement under the WICA. There is evidence in the record establishing fact questions on the claims against defendant Monica Childs for malicious prosecution, fabrication of evidence, civil conspiracy, and intentional infliction of emotional distress, and those claims are not time barred or precluded by any of the other procedural and jurisdictional obstacles asserted by the defendants. Defendant Childs is not entitled to qualified immunity on those claims. No evidence has been presented to sustain the claims against defendants Karvonen, Mueller, Love, Dembinski that they participated in any fabrication of evidence or conspiracy to violate the plaintiff's rights. The claims for "abuse of process" and "failure to intervene" are unsupported by any substantial evidence.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendants Wayne County and Robert Donaldson (ECF No. 103) is **GRANTED**.

It is further **ORDERED** that the motion for summary judgment by defendants Monica Childs, Gene Karvonen, Roger Mueller, Walter Love, and John Dembinski (ECF No. 93) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that amended complaint is **DISMISSED WITH PREJUDICE** as to defendants Wayne County, Robert Donaldson, Gene Karvonen, Roger Mueller, Walter Love, and John Dembinski, only.   The claims for abuse of process and failure to intervene are **DISMISSED WITH PREJUDICE** as to all defendants.   The DPD defendants' motion is **DENIED** in all other respects.

It is further **ORDERED** that counsel for the plaintiff and defendant Childs shall appear before the Court for a status conference on **January 18, 2024 at 10:00 a.m.** to schedule a trial date and related deadlines.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   December 19, 2023

- 38 -